## SOUTHWESTERN BELL TELEPHONE CO. v. BUCKNER.   (No. 2997.)

(Court of Civil Appeals of Texas. Texarkana.
Feb. 13, 1925. Rehearing Denied
Feb. 26, 1925.)

**1. Telegraphs and telephones ☞66(4)—Evidence held insufficient to prove mental anxiety as result of defective telephone.**

In action for breach of contract to repair telephone, at a time when plaintiff's husband was ill, and frequent calls for a doctor were necessary, evidence *held* insufficient to prove mental anxiety as result of defective telephone service in view of plaintiff's free use of a neighbor's telephone without appreciable delay or loss of time in calling doctor.

**2. Telegraphs and telephones ☞68(1)—Mental anxiety not recoverable for breach of agreement to repair telephone.**

Mental anxiety or distress of mind is not an element of damage recoverable for simple breach of special agreement to repair telephone.

**3. Telegraphs and telephones ☞68(1) — Defendant not having caused mental anxiety in inception not liable for prolonged anxiety.**

Where plaintiff's telephone had been out of order at time her husband was sick for some days before defendant had knowledge thereof, defendant could not be held liable for anxiety of mind in action for tort based on failure to repair telephone after being notified of defect, since such anxiety of mind must have existed before defendant's duty to repair arose, and damages cannot be recovered for a mere continued or prolonged anxiety, the anxiety in its inception not having been proximately caused by defendant's default.

**4. Telegraphs and telephones ☞68(1)—Damages for uneasiness due to inability to notify relatives of death not recoverable.**

Plaintiff, suing for breach of contract to repair telephone could not recover damages for uneasiness occasioned because of inability to quickly notify relatives of husband's death.

**5. Telegraphs and telephones ☞66(4)—Evidence held insufficient to prove mental anxiety as result of inability to quickly notify relatives of death of husband.**

In action for breach of contract to repair telephone, evidence *held* insufficient to prove mental anxiety or distress as result of inability to quickly notify relatives of death of plaintiff's husband.

Appeal from District Court, Harrison County; P. O. Beard, Judge.

Action by Mrs. Cora Buckner against the Southwestern Bell Telephone Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

The appellee secured a verdict in an action for damages predicated upon the appellant's alleged negligent performance or breach of an agreement, made under special circum-

stances, to repair a telephone, and the latter seeks a reversal of the judgment thereon.

Omitting formal parts, the petition alleges:

"During the year 1919, plaintiff and her husband became subscribers to the rural telephone service of the said defendant, and the defendant undertook to furnish them with proper telephone facilities, to give them reasonable and courteous service, and at all times to keep said telephone facilities in good repair, in return for which the plaintiff and her said husband were to pay a fixed charge. That said charge was and always has been promptly paid when due. That the plaintiff lives about four miles from the city of Marshall, Tex., on the Grange Hall road. On or about December 18, 1923, her husband became seriously ill, and, in order to secure the proper medical attention at proper times, it was imperative that the plaintiff have prompt and efficient telephone communication between her home and the city of Marshall, Tex. That the telephone box furnished by the said defendant at this date was out of order, and it was impossible to establish communication with Marshall, Tex., by means of said telephone box, and that the physician who was attending the plaintiff's husband called upon the agents of the defendant and then and there informed them of the facts and circumstances requiring the prompt and speedy repair of the said telephone box. That plaintiff, after defendant's agents had been informed of the imperative necessity of having said telephone box immediately repaired, procured the said telephone box to be sent to the office of the said defendant in Marshall, Tex., and again the defendant's agents were informed of the facts and circumstances rendering it necessary that the instrument be repaired at once, and plainly requested that such repairs be immediately made, which the said defendant and its agents agreed to do, the plaintiff being at all times ready and willing to pay the said defendant any reasonable charge which might have been demanded for such services in making said repairs. That although informed of the circumstances in such unmistakable terms, the defendant's agents kept the said telephone instrument in their possession for full two days before they would again deliver same to plaintiff, though request for delivery was made each day. That the said telephone instrument when again installed at the home of the plaintiff was in the same condition as it was before being submitted to the said defendant's agents for repairs, and that in fact the said defendant's agents had retained the telephone box for the space of two full days, and had negligently failed and refused to repair same in any manner whatever, although at the time the said instrument was redelivered the defendant's agents represented that it was fully repaired. That, as a direct consequence of the gross and willful neglect of the defendant's agents to make such proper and necessary repairs after having been duly requested to do so, and after having been notified of all the surrounding circumstances, this plaintiff, a lady of advanced years and at that time in ill health, was forced to walk a distance of about one-half mile to the house of a neighbor at all times of the day and night in order to telephone for medical attention for her husband. That during all of the time of her said husband's illness the weather was extremely inclement, and that heavy rain was falling almost continually. That plaintiff, because of this great delay in obtaining medical attention for her husband at the proper time, suffered the most intense mental pain and anguish, and labored under the constant apprehension that her husband was likely to die at any moment before she would have sufficient time to get medical aid. Plaintiff further represents that because of the intense mental pain and anguish she suffered, and because of her exposure to rain and cold in going to the house of her neighbor to telephone for medical aid for her husband, all brought about by the negligent failure and refusal of the defendant's agents to perform their plain legal duty, she suffered a nervous collapse which developed into a serious case of pneumonia, which caused her intense pain and suffering of both mind and body, which caused her to be unable to attend her husband, who was then at the very door of death, and which caused her to be confined for a period of about three weeks, during which time she was unable to attend to any of her business or household affairs. Plaintiff further represents to the court that her said husband died on December 26, 1923; and because of the negligent failure and refusal of the defendant's agents to properly repair her telephone box, she, being ill and having no other means of communication with the outside world, was forced to delay notifying his and her relatives for a period of about six or eight hours. That all of which things caused plaintiff to suffer the most intense, cruel, and inhuman agony and pain of mind, body, and spirit, to her great damage in the sum of $2,500."

The appellant, besides general denial, specially plead that the telephone line to which the appellee's telephone was connected was not owned and controlled by it, and that it was not its duty nor had it contracted to maintain or keep in repair the telephone or telephone line, and that if the telephone was in such condition that it could not be used it was on account of the batteries in the telephone being worn and out of repair, or because the telephone was improperly connected, all of which it was the appellee's, and not the appellant's duty to repair, furnish, and connect.

It was proven that appellee resided three miles out from Marshall, on the Carter's Ferry road, and that she was a subscriber to a "rural party line," on which were eight or nine telephones, one of them being in appellee's house. The appellant did not own the line, and had nothing to do with the control or maintenance of the same. The line was privately owned, and was maintained by the several subscribers on it. The appellant provided the telephone instrument to each subscriber on the line, for which they were to pay the sum of 25 cents a month as rent. This party line is connected with appellant's line "at the city limits;" and for this connection, together with service in the "central office," the appellant made the

charge to each subscriber on the party line of 75 cents a month. The evidence appears as follows:

"There were eight or nine' telephones on that line. Mr. Roberts now manages that line. I pay Mr. Roberts for my telephone service. I do not pay the company here in town. Mr. Roberts has charge of that line and he collects from all the people. I do not know who owns the line. It was up there when we went there."

On December 16, 1923, the appellee's husband was stricken with pneumonia which caused his death on December 26, 1923, at 6:10 a. m. At the time the husband became ill the telephone in the house was not in good working order, as testified to by appellee. She testified:

"On December 16, 1923, my husband became ill with pneumonia. I had a doctor in attendance upon him during the time. The condition of my telephone at that time was bad. For a few days after he became ill I could get central office at Marshall by getting some of the neighbors to ring and help me. After that I could not get central at all. On Christmas Eve I sent the telephone box in to the defendant's office to have it fixed so I could get a doctor. It appeared to me necessary to obtain a doctor for my husband on short notice. I could not do that with my telephone in the fix it was. I sent my telephone box to the telephone office to Mr. R. W. Williams. I think it was about 9:30 or 10 o'clock in the morning when I sent it. Mr. Williams came back to my house that afternoon, but he did not bring the telephone box. I got it on Christmas Day at about 12 o'clock noon. The telephone was then again installed in my, house when it was brought back. I then attempted to get in communication with central office in Marshall, but failed. I had all the neighbors to attempt to repair the telephone, but they could not get it to work. Two of my brothers worked on it. Mr. Harris, Mr. Jennings, and Mr. Morse worked on it, but none of them could get it in condition for me to talk over it. It was in the same condition that it was before I sent it to the office of the defendant."

R. W. Williams testified, as pertinent:

"At the request of Mrs. Buckner I took her telephone box and delivered it at the telephone office on December 24, 1923, at about 9:30 or 10 o'clock a. m. I told the telephone people at the telephone office that the box was out of fix and Mrs. Buckner wanted it fixed. I told him that the man that the telephone belonged to was sick and needed it. I told him that the telephone belonged to Mr. Buckner. He replied that he would fix it soon after 12 o'clock, or something like that. I laid the telephone on a table in the back room. * * * I returned for it about 2 o'clock p. m. on the same day. There was a different gentleman in the office when I returned for it. I asked the gentleman there if it had been fixed. He didn't seem to know much about it, whether it was fixed or not. He said he didn't know anything about it. I then went on out to Mrs. Buckner's house and told her about it."

After Mr. Williams informed appellee, as stated above, she "went," as testified, "to the home of Mr. Gene Sanders to telephone to the office of the telephone company" about the telephone. At the request of appellee Mr. Mortimer Harris went after the telephone. He testified:

"I live in Marshall. My wife and I and Mr. Moxley went to the telephone office on December 25, 1923, in the morning, and got Mrs. Buckner's telephone and carried it out to her house. I connected up the telephone at Mrs. Buckner's house, but I could not obtain connection with the telephone office in Marshall, or with any one else. Mr. Morse and Mr. Moxley assisted me to connect the telephone. It would not ring. * * * I never connected any other telephone. I do not know anything about connecting telephones, or the wires."

Mr. Morse, witness for appellee, testified:

"I examined her telephone. No one helped me work on her phone. I could not get central office. I tried, but could not. I tried to fix it one way and other. I fixed it like mine was fixed, but I could not get central office. I changed the batteries. I had batteries on my telephone and put them on Mrs. Buckner's telephone, but her telephone would not work then. Her telephone was connected like mine. I do not know what was the matter with her telephone. My batteries were good. The telephone would ring when I would turn the crank, but I did not hear anybody answer over it. I tested every part of the phone I could. I could not hear anything. I never did work in the telephone business. All I know about the telephone business is that I installed the telephone in my house. The one at Mrs. Buckner's is like mine. * * * I know the battery was not the trouble."

Mrs. Fyffe, a witness for appellee, testified:

"I live close to Mrs. Buckner, and south of her. I had a telephone in my house, on the same rural line with Mrs. Buckner. I went to her house while her husband was sick. Her telephone was out of fix. She could not get central. At that time I was getting service over my telephone. I was not having any trouble with my telephone at that time, and could get central office during that time."

There appears further evidence on the part of appellee that the rural line was in repair and working order.

The appellant's evidence goes to show a complete testing of the telephone when it was delivered to it on December 24, 1923, and that it was promptly ready for delivery to appellee on the same day. Mr. Arnette, witness for appellant, testified:

"Mr. Williams delivered the telephone to me on December 24, 1923. I am the wire chief of the company. I made a thorough test of the telephone to see whether or not it was in working order, I found it all right in every way. It was in working condition. I was not there when Mr. Williams came. I gave the chief operator, who was a lady, instructions about delivering it. I went to the city limits and

tested back to the office, and rang back to find whether or not the line was in trouble. I got the chief operator, and we talked and rang both ways. That showed that the line was all right to that place. It is not my duty to look after the rural line further than from the city limits. The subscribers on the rural line have charge of the line beyond the city limits. * * * I cannot tell why it did not work on December 25, and have no reasons to offer for its failure. If all the rest of the subscribers were getting central at that time there was no trouble with the telephone line. The trouble could not be with the line. * * * I afterwards examined the line and found the wire down. I do not say they were down in December. * * * It may be if Mrs. Buckner could not get central at the time, that the telephone was not hooked up right; or there may have been a short circuit, or the wires may not have been grounded properly. * * * It is not the duty of the company to furnish batteries for the phones on rural lines."

It was shown by appellee's evidence that the company provided batteries on several occasions for some of the telephones on that line, but in each instance made a charge therefor of 90 cents for two batteries.

The character of injury suffered by the appellee, and the attendant circumstances, are shown in the quoted evidence. The appellee testified:

"When my telephone went out and I could not talk over it I had to go or send some one to the home of Mr. Gene Sanders to talk over his phone. His home is a quarter of a mile from mine. There was not always some one to send over to Mr. Sanders'. I only went to Mr. Sanders' to use the telephone twice. Others that were sitting up with my husband went several times. Not being able to get communication with the doctor on short notice made me nervous, like any one else would be that wanted a doctor; and, of course, it hurt me and made me nervous. My health was bad, and not good at all. I was affected physically by my trip to the home of Mr. Sanders. I walked so fast up to Mr. Sanders' and back again that I was out of breath. I got too hot going out in the cold, and it gave me a spell—a touch of pneumonia. I was broken down and had to go to bed, and I stayed in bed about a week. The weather at that time was rainy and cold, and the ground muddy. * * * It was about December 20 that the telephone got out of fix. About December 18, right after my husband got sick, was the first time I went to the home of Mr. Sanders to talk over the telephone. My telephone could be worked then by having some neighbors help me ring, that is, sometimes I could get central and sometimes I could not. I went to the home of Mr. Sanders to telephone my sister to come and to bring some medicine. That is the first time I went to Mr. Sanders' to telephone. That is all I went for. The doctor had been there, and he told me to get an ice bag. On Christmas Eve I went to Mr. Sanders' again. I went to the telephone to talk to the manager of the telephone. I did not go to telephone for a doctor or for relatives. I did not go but twice; once on December 18, and one time

on Christmas Eve. I never did talk to the doctor over the phone from Mr. Sanders' home, but others did. The doctor came to see my husband every morning, early. He did not call at any other times of the day except when we would call for him. If we called his office and he wasn't there we would leave a request for him to come out, and he always came in response to the messages left. * * * I was in the room with my husband before he died, but I left out of there because I could not stand the suffering. A gentleman was at his bedside. I thought he needed a doctor at that time. This was at night. My sister went to Mr. Sanders' and telephoned Dr. Wyatt, the doctor, and he was out. She then called another doctor, but he did not come. * * * The fact that I could not get a doctor or doctors at the time I wanted them had an effect on my feelings and mind. I was exercised over my husband's condition from the time I found he was seriously sick. I suffered mental anxiety over him. The telephone getting out of fix prolonged and increased my anxiety about him. I was suffering before, and that made it worse. I did not sleep during those nights. I would stay up and see that the medicine was given him, and I was anxious about my husband. * * * When my husband died I gave directions about who was to be phoned to and telegraphed to. Mr. Browning telephoned to Mr. Buckner's relatives, and my sister Mrs. James telephoned to my people. I left the matter of telephoning these people up to Mr. Browning and Mrs. James. I did not want to do that under the circumstances. My husband was dead, and I did not feel like attending to it under the circumstances."

Mrs. James testified:

"I was at Mrs. Buckner's when her husband died. Under Mrs. Buckner's directions I went to Mr. Gene Sanders' home to do the telephoning. Mr. Buckner died at 6:10 o'clock of December 26. I got to Mr. Sanders' home at 6:20 o'clock a. m., about ten minutes thereafter. I first telephoned the doctor. I next telephoned our sister Mrs. Alford. I then phoned our sister in Palestine. I was between 30 and 40 minutes getting this sister. * * * I was at Mrs. Buckner's when she wanted the doctor. Every time I telephoned for her for the doctor he came in pursuance of the request."

Mr. Browning got in ready communication with the relatives of the deceased.

The charge of the court authorized the jury to "allow the plaintiff such damages for mental anguish and suffering as directly and proximately resulted from the negligence, if any, of the defendant," in the event they found the appellant "negligently failed to repair said telephone box in a way that it could be used for the purpose of telephoning," after having "accepted said telephone box for the purpose of promptly repairing the same" and in knowledge of the special circumstances existing. The charge expressly excluded the allowance of "any damages for any physical suffering she may have endured in going to the telephone of a neighbor, or for any physical suffering or illness resulting from her walk to her neighbor,"

(269 S.W.)

and "any damages for the mental suffering and anguish on account of the serious sickness and death of her husband which may have been endured as a result of such sickness."

Young & Stinchcomb, of Longview, and C. C. English, of Dallas, for appellant.

F. M. Scott and B. R. Lindsay, both of Marshall, for appellee.

LEVY, J. (after stating the facts as above). The instructions given by the court to the jury are expressed in proper terms of law, and no fault can be found in them. This conclusion eliminates from the consideration of the case many of the questions sought to be raised by the assignments of error.

[1] The main question presented in the appeal is that of whether or not the mental disturbance caused to the appellee by the appellant, such as the evidence shows, can be held to be an element of the damages resulting from the breach of contract, for which a recovery is allowable under the law. According to the evidence the appellee's husband became ill with pneumonia on December 16, 1923, and continued to grow worse until he died at 6:10 a. m. on December 26, 1923. At that date of December 16 the telephone in the appellee's house was not in good working order, and "in a few days" afterwards, about December 20, got in the condition that appellee "could not get central at all." The appellee desired to have the telephone in good working order because, as she stated, "it appeared to me necessary to obtain a doctor for my husband on short notice." Thereupon, on December 24, 1923, at between 9:30 and 10:30 o'clock in the morning the appellee sent the telephone to appellant for repair, stating the special circumstances of her husband's sickness and the need of the telephone for communicating quickly with the doctor. It appears that the telephone was not returned to the appellee's home until the next day, December 25, 1923, at noon, and it still failed to work. The appellee's state of mind, in virtue of the situation, is described by her as follows:

"When my telephone went out and I could not talk over it, I had to go or send some one to the home of Mr. Gene Sanders to talk over his telephone. * * * Not being able to get in communication with the doctor on short notice made me nervous, like any one else would be that wanted a doctor, and, of course, it hurt me and made me nervous. * * * The fact that I could not get a doctor or doctors at the time I wanted them had an effect on my feelings and mind."

But, in the light of the undisputed evidence, no facts appear, aside from the serious illness of the husband, which were reasonably calculated to produce in the mind of the appellee serious anxiety on account of the telephone in her home being out of or-

der. The doctor was each day regularly attending the husband, and he knew all about his serious condition and the need of coming back again. Appellee knew this fact, and she further knew that the telephone of her neighbor, Mr. Sanders, was being used at her instance by those present attending upon her husband, for making special calls for the doctor. During all the time from December 20, when the telephone ceased to work, to December 26, inclusive, when her husband died, the appellee had free use of the telephone at Mr. Sanders' home whenever it was needed, and no appreciable delay or loss of time is shown in making calls for the doctor, due to the resort of using the telephone at Mr. Sanders' home. Neither was there any failure of effort, on account of telephone service or lack of it, to have the doctor called when needed, due to the resort to the telephone at Mr. Sanders' home. All of these facts were known to appellee, therefore it is apparent that the facts do not furnish a substantial cause of action for damages for mental anxiety for which a recovery can be had.

[2] And even assuming for the moment that appellee did suffer reasonable anxiety, the appellant nevertheless would not, in view of the evidence, be legally liable for such element of damage for the breach of contract to repair the telephone. It was not the appellant's duty, in the evidence, to repair or to keep the telephone in repair. The appellant had only rented the particular telephone, as such, to the appellee, and did not own, control, or manage the rural party line. It was the appellee's duty to repair the telephone and keep it in repair. The repair of the telephone on the particular occasion was by and under a special agreement with appellant to do so. Mental anxiety or distress of mind is not an element of damage legally recoverable for the simple breach of a special agreement, as here, to repair a telephone box.

[3] Moreover, treating the case as an action for tort, as the parties seem to have done, for breach of a corporate duty of the appellant, in knowledge of special facts, to repair the telephone and re-establish telephone communication in the appellee's home, it is difficult to distinguish the case in principle from the case of Rowell v. Telegraph Co., 75 Tex. 26, 12 S. W. 534. That case ruled that "mere continued" or prolonged "anxiety" is not an element of damages recoverable at law. The "anxiety" there existed before the default sued on. Quoting from that case:

"The damage here complained of was the mere continued anxiety caused by the failure promptly to deliver the message. Some kind of unpleasant emotion in the mind of the injured party is probably the result of a breach of contract in most cases, but the cases are rare in which such emotion can be held an element of damages resulting from the breach. For

injury to the feelings in such cases the courts cannot give redress."

The following cases adhere to the Rowell Case: Johnson v. Telegraph Co., 14 Tex. Civ. App. 536, 38 S. W. 64; Telegraph Co. v. Giffin, 93 Tex. 530, 56 S. W. 744, 77 Am. St. Rep. 896; and others. Quoting from Telegraph Co. v. Edmondson, 91 Tex. 210, 42 S. W. 549:

"We have neither authority nor inclination to extend the right of recovery in this class of cases beyond the limits already fixed by the decisions of this court."

In the instant appeal it is made to appear from the facts that the appellee's anxiety that she be able to quickly notify the doctor to attend her husband had its inception and origin at the time the telephone ceased to work, about December 20. That anxiety was not proximately caused by the appellant's default, and the appellant's default subsequent to that date did not, as admittedly shown, operate to cause or originate any different state of mental distress. The mental anxiety originally created by the situation beginning on December 20 was, at most, merely continued or prolonged and no more, through the appellant's failure to repair the telephone. Hence there is established by the facts no more than "the mere continued anxiety" of the appellee, having origin before the date of the appellant's alleged default. The controlling facts are not essentially different from the Rowell Case, and that case would rule the present one.

The instant case is quite different from, and not comparable with, the case of Telegraph Co. v. Cavin, 30 Tex. Civ. App. 152, 70 S. W. 229, and other like cases cited. In that case there was more than "mere continued anxiety" appearing. The state of mind in that case, authorized by the existing facts, was to the degree of "mental anguish" originally and solely resulting from the negligent failure to deliver the telegram to the doctor in time to come and give medical aid to the sick child. There was actual and appreciable delay in having medical attention for the child, very hurtful in consequence.

[4, 5] The appellee further claims that she suffered mental distress over the fact that she could not quickly notify relatives of the death of her husband. Uneasiness so occasioned cannot, in view of the evidence, be made the subject-matter of contract. Morrison v. Telegraph Co., 24 Tex. Civ. App. 347, 59 S. W. 1127. The evidence does not show any reasonable ground upon which to predicate liability against appellant for damages for anxiety or distress in this respect. The appellee testified:

"When my husband died I gave directions about who was to be phoned to and telegraphed to. * * * My husband was dead, and I did not feel like attending to it under the circumstances."

At the special instance of appellee, Mr. Browning and Mrs. James notified the relatives, and no delay in notifying them appears further than ordinarily would have happened had the telephone in the appellee's house been in good order. Mrs. James testified:

"Mr. Buckner died at 6:10 o'clock a. m., and I got to Mr. Sanders' home at 6:20 o'clock a. m., about 10 minutes thereafter."

The judgment is reversed, and judgment is here rendered in favor of appellant, with costs of the trial court and of appeal.

### On Motion for Rehearing.

The appellee strongly insists that the facts of the case bring it within the case of Tel. Co. v. Cavin, supra, and not within the Rowell Case, supra. The facts, as stated, show that the appellee was very much exercised and nervous at not being able to use the telephone beginning with the date of December 18, and she continued in that mental condition to the date of the death of her husband on December 26, at 6:10 a. m. But it was not until December 24 that any liability of appellant could be said to arise. The entire testimony is that it was "on December 24, 1923, at about 9:30 or 10 o'clock a. m." that the telephone was delivered to appellant for repair and the special circumstances of its need disclosed to its employees. The mental anxiety originally created by the situation beginning on December 18 was merely continued or prolonged through appellant's failure to repair the telephone on and after December 24. She testified:

"Not being able to get in communication with the doctor on short notice made me nervous. The fact that I could not get a doctor or doctors at the time I wanted them had an effect on my feelings and mind."

Her mental condition was that way on December 18 and 20, and unchanged to December 26. And from December 24 to the death of her husband she was not without help. As Mrs. Frye, testified:

"I was at Mrs. Buckner's when she wanted the doctor. Every time I telephoned for her for the doctor he came in pursuance of the request."

This suit is based entirely on a special contract to repair a telephone, and legal liability for mental anguish, as an element of damages, is not established.

The motion for rehearing is overruled.